STANDARD OIL COMPANY, APPELLANT, V. JAMES O'HARE, APPELLEE.

FILED JANUARY 26, 1934.   No. 28651.

*William H. Herdman* and *Cook & Cook,* for appellant.

*Joseph E. Daly, contra.*

Heard before GOSS, C. J., ROSE, GOOD, EBERLY, DAY and PAINE, JJ., and CLEMENTS, District Judge.

CLEMENTS, District Judge.

The appellant, Standard Oil Company, hereinafter called the plaintiff, claiming to be in possession of certain real estate in North Bend, Nebraska, under and by virtue of a lease executed by James O'Hare and W. H. Byrne, seeks an order in injunction, restraining the appellee, James O'Hare, hereinafter called the defendant, from entering and trespassing on the demised premises, and from interfering with, obstructing, or resisting plaintiff's possession of said premises, and from interfering with, obstructing, or resisting plaintiff in operating its filling station on said premises.

The defendant claims to be the owner of said premises, denies that the plaintiff is now or ever has been in possession thereof, or that plaintiff now has or ever has had the right to the possession thereof, and denies the validity of plaintiff's purported lease.

The cause was tried as an action in equity before Honorable Frederick L. Spear of the sixth judicial district, resulting in a general finding for defendant, and a judgment dismissing the action, canceling the purported lease

and quieting defendant's title as against the plaintiff's claim. The plaintiff brings the action to this court on appeal.

It appears from the evidence that some time prior to March 14, 1930, the defendant James O'Hare and his brother-in-law, W. H. Byrne, contemplated building and operating a gasoline service station on lot 5, block 51, of the city of North Bend, Nebraska. At that time O'Hare owned 5 lots of this block, the remaining lots being owned by a party by the name of Thom. The plan of O'Hare and Byrne contemplated the purchase of the Thom lots by Byrne, and the building of the service station thereon to be owned and operated by the parties as equal partners. The intention of these parties coming to the notice of the plaintiff, Standard Oil Company, it sent a representative to interview them, and to induce them, if possible, to handle and sell Standard Oil Company products exclusively. After an extended conference held on March 14, 1930, between this representative, one John F. O'Connell, and O'Hare and Byrne, at the home of O'Hare, in North Bend, an agreement was reached. This agreement was evidenced by two written instruments, the purported lease and the so-called agency agreement set out in the plaintiff's petition. The lease was, at said time, signed and acknowledged by both O'Hare and Byrne, although Byrne was not yet the owner of any part of the property. However, he afterwards purchased the Thom lots. The agency agreement was signed by Byrne. At the time that this agreement was made, there was located on lot 5 a blacksmith shop, which the evidence shows was of the reasonable rental value of $20 a month and which, at that time, and during all the time of this litigation, was and has been rented for such sum.

Under the terms of the purported lease, the defendants leased to the plaintiff lot 5, including driveways, filling station, and appurtenances, for a period of five years, with an option on the part of plaintiff to extend the term to ten years, at an annual rental of $300, payable $25 each month. In this purported lease, the defendants bind

themselves to build on said lot a gasoline filling station, expending for such purpose not less than the sum of $3,000. No rental to be paid until service station is completed.

It will be seen that the plaintiff, by collecting $20 each month for the blacksmith shop, and applying it on the rental for the use of the service station, would only have to apply $5 of its own money on such rental. The lease provides further that the defendants shall pay all water taxes, and all general and special taxes and assessments that may be levied and assessed against said premises or property owned by them located thereon, and will pay any and all license fees, occupation taxes, and other taxes, impositions and other charges levied against or imposed upon the business conducted on the demised premises and the equipment located thereon, and to furnish, without expense to second party, heat for the demised premises, and pay for all the electricity and water consumed thereon.

At the same time and as a result of the said conversations, the agency agreement was prepared and signed by Byrne. This contract provides in effect that Byrne is to operate the service station, handle the Standard Oil Company products, sell gasoline furnished by the plaintiff at 3 cents a gallon over the wholesale price. This spread between the retail and wholesale prices being called his commission.

It is the plaintiff's theory that these two instruments have no relation to one another. That the purported lease *is* a lease giving it the right of possession of lot 5, the service station to be erected thereon, and all appurtenances thereto, for a period which, at its option, can be extended to ten years; that the agency agreement is simply an agreement to employ Byrne during the pleasure of the plaintiff, and subject to be revoked at any time it so elects. O'Hare and Byrne contend that the sole object and purpose of the parties was, on the part of the plaintiff, to secure a dealer at North Bend, and an outlet for

its products there; on their part, to handle these products on as favorable terms as possible; that both instruments are a part of one agreement; that the so-called lease was never intended to operate as a lease; that it was never intended that the possession of the premises was to pass to the plaintiff, and that the plaintiff never did have possession thereof; that, when it became evident that the plaintiff was claiming some right to the premises by virtue of the lease, they repudiated the entire agreement, refused to receive any payments under the lease, and opened and operated their service station without reference to said agreements.

We think the evidence, the character of the instruments, and the subsequent conduct of the parties amply sustain this contention. O'Hare and Byrne testify in effect that the main object and purpose of the parties was to effectuate an agreement whereby they were to become Standard Oil dealers handling Standard Oil products exclusively; that oil companies generally fix both the wholesale and retail price of their products; that the spread between the wholesale and retail price of Standard Oil products is less than that of most other oil companies; that to induce them to handle its products the plaintiff agreed to allow them a bonus or rebate of $25 a month, and to furnish certain equipment free of charge; that to cover this up and to avoid friction with the federal trade commission, the fiction of the lease and agency agreement was devised.

The representative of the plaintiff, John F. O'Connell, who prepared both instruments, denies this, and testifies that nothing was said about bonus, and that the instruments are, in fact, what they appear to be, in form, a lease and an agreement to employ.

An examination of the terms of these instruments leads to the inevitable conclusion, either that they must be construed together to the same effect as though they are one writing, the purport of which is to permit O'Hare and Byrne to retain possession of their own service station,

while selling Standard Oil products, or that O'Hare and Byrne are incompetents, incapable of doing business, and the transaction is so grossly inequitable and unconscionable as to amount to constructive fraud, and render it unenforceable in a court of equity.

Construing the transaction, in accordance with the theory of the plaintiff, we find that O'Hare and Byrne agreed to build a service station to cost at least $3,000, on a block of their own land, which the plaintiff pleads is a valuable business location because located on the Lincoln Highway, buy the plaintiff a license to do business, pay its occupation tax, heat the building, pay for water and electricity, and pay all property taxes on real estate, service station and equipment, all for $5 a month above the sum the plaintiff would receive for rental of the blacksmith shop.

After the purported lease and agency agreement were executed by O'Hare and Byrne on March 17, they were sent to the Standard Oil Company to be signed by it, if approved. On April 1, 1930, the lease was returned to O'Hare and Byrne, executed by the plaintiff, with a letter informing them that the agency agreement would be held until the station is completed and in operation. O'Hare and Byrne then built the service station at a cost of, not $3,000, the minimum stated in the so-called lease, but at about the sum of $8,000. On August 27, 1930, the station was completed, and they were ready to open it for business. They had heard nothing further from the plaintiff in relation to the agency agreement, and had no notice or knowledge of whether or not it had been approved or signed.

The signing of the lease and agency agreement by O'Hare and Byrne and its transmittal to the plaintiff to be approved or rejected was simply an offer to contract on the terms specified. Before the offer could ripen into a contract, it would have to be accepted, and notice of its acceptance given the offerers within a reasonable time. If, as we have found, the so-called lease and agency con-

tract are to be construed as embodying one agreement, then the acceptance and approval of the lease alone was not an acceptance of the offer. The offer was made on March 17. More than five months thereafter, on August 27, when the station was completed, no notice had been given the offerers that that part of it, relating to the agency agreement, had been or would be accepted, except a vague statement that it was being held. We think the offerers had a right to consider the offer rejected.

"It is a well-established principle of the law of contracts that an offer does not ripen into a contract unless accepted; that if the offeree within a reasonable time does not accept the offer, it may be treated as if rejected. * * * What constitutes a reasonable time must * * * be a question of fact." *Kukuska v. Home Mutual Hail-Tornado Ins. Co.*, 204 Wis. 166.

"Communication of acceptance is essential, where offer requires promise on part of offeree." *Port Huron Machinery Co. v. Wohlers,* 221 N. W. 843 (207 Ia. 826).

"It must be kept in mind that there is a distinction in regard to communication of acceptance between offers which ask that the offeree shall do something, as in the instant case, and offers which ask that the offeree shall promise something. In offers of the latter kind, communication of the acceptance is always essential." *Port Huron Machinery Co. v. Wohlers,* 207 Ia. 826. See, also, *Omaha Loan & Trust Co. v. Goodman,* 62 Neb. 197.

On August 27, the service station being completed, O'Hare and Byrne, no notice of acceptance of that part of the agreement relating to the agency having been received, bought a stock, opened the service station, and commenced its operation. On September 23 a duplicate copy of the agency agreement was transmitted to W. H. Byrne, with a letter in which the plaintiff expressed sorrow that it had not been sent sooner. The premises were then in possession of the defendants; they had been doing business for nearly a month. We think the acceptance of the offer came too late.

It is true that the initial stock was bought of the plaintiff and that O'Hare and Byrne, during nearly or quite all the time they operated the service station before the inception of this litigation, continued to purchase Standard Oil products on practically the same terms set out in the agency agreement, but there is no evidence that these terms were different than the terms usually given independent dealers using such products.

On September 30 the plaintiff sent a check to O'Hare and Byrne for a month's rent, which was refused. Regularly each month thereafter the plaintiff sent a similar check for the same purpose, which was as regularly refused. From this time there seems to have been a constant dispute between the parties, plaintiff claiming that the defendants were in possession of the service station as its agent under the lease, the defendants denying this and repudiating the lease. A mass of evidence was taken at the trial regarding this dispute and regarding communication and meetings between the parties in an attempt to adjust it. We do not think it necessary to review this evidence.

There was also evidence of various statements of counsel for plaintiff, that plaintiff at the inception of the agreement between the parties had no knowledge that the blacksmith shop was on the premises, and that plaintiff claimed no rental therefrom, but no offer to have the lease reformed to exclude the blacksmith shop has been made by it, and at the trial of the case, when evidence was offered that the blacksmith shop was not to be included in the agreement, the offer was met by objections that it was an attempt to change and vary the terms of a written instrument by parol.

We find from the foregoing: That the execution of the purported lease and agency agreement and their transmittal to the plaintiff for approval and rejection was an offer to contract on the terms contained therein; that said instruments should be construed together to the same extent as though they were contained in one writing.

That an acceptance of the terms of the lease alone, and notice to O'Hare and Byrne of such acceptance, was not an acceptance of the offer.

That notice to O'Hare and Byrne five months after the offer was made, and a month after the service station was opened, of the acceptance of the terms of the agency agreement was not within a reasonable time, and O'Hare and Byrne, at the time of the opening of the station, had the right to assume that the offer was rejected.

That the plaintiff never had possession of the service station under the purported lease, and that this action brought to protect a possession which never existed must fail.

"A litigant cannot successfully invoke the extraordinary remedy of injunction, the effect of which would be to obtain possession of real estate, unless the facts and circumstances in the case are such that his ordinary legal remedies are inadequate." *Hollinrake v. Neeland,* 94 Neb. 530.

It follows that the finding and judgment of the trial court is correct.

AFFIRMED.

ROSE, J., dissenting.

The premises in controversy were leased in writing for the specific use and single purpose of a filling station where petroleum products of plaintiff were to be kept and sold. It was so understood by the parties to the lease. Plaintiff tendered each month the stipulated monthly rental of $25 and never claimed or received any income from the blacksmith shop. The income therefrom was paid to and accepted by lessors. Without fraud of any kind the parties to the lease contracted for a monthly rental of $25, which was lawful compensation for the use of the leased premises and the improvements the lessors agreed to make. The consideration stated was within the contracting power of the parties. The lease was formally drawn, executed, acknowledged, delivered

and registered. Through the agency of lessors the petroleum products of plaintiff were in fact kept and sold for a time on the leased premises—what was contemplated by the parties. As I view the evidence, all parties to the lease understood and performed it at first with plaintiff constructively in possession of the demised premises. Defendant dispossessed plaintiff, and thus violated his duty as agent under the lease, interfered with his employer's present and future business, and destroyed contractual and property rights of his principal. To prevent the continuance of such wrongs injunction is the proper remedy, as formerly held in this identical case. *Standard Oil Co. v. O'Hare,* 122 Neb. 89. That the former decision is sound and supported by precedent, see *Shell Petroleum Corporation v. Ford,* 255 Mich. 105, 83 A. L. R. 1413, and note. Delay of plaintiff in formally accepting the offer of agency did not destroy the property rights created by the lease. Services of the agent, performed for plaintiff and accepted pursuant to the terms of the contract of employment, waived prompt acceptance of the offer of agency, if delayed. The option of plaintiff to terminate the lease upon 30 days' notice did not invalidate it, since it created an estate for a fixed term of years. *Shell Petroleum Corporation v. Ford,* 255 Mich. 105, 83 A. L. R. 1413, and cases cited in note. Whether considered as a unit or as two instruments, the lease and the contract of agency were duly executed, delivered, valid agreements, as I view them in the light of the evidence and the mutual understanding of the parties in the first instance. Entertaining these views, I dissent from the affirmance.

DAY, J., concurs in dissent.