[Civ. No. 15039. Second Dist., Div. One. Feb. 18, 1946.]

CLYDE H. BRAWLEY et al., Respondents, v. CROSBY RESEARCH FOUNDATION, INC. (a Corporation) et al., Appellants.

Conroy & Conroy, Edward L. Conroy, Chambers & Lyman and Robert Chambers for Appellants.

LeRoy B. Lorenz for Respondents.

WHITE, J.—Defendants appeal from an adverse judgment rendered against them in an action for declaratory relief under section 1060 of the Code of Civil Procedure, construing a contract for the development, exploitation and commercialization of a rotary pump.

By their amended complaint plaintiffs in substance alleged that on and for some time prior to May 15, 1944, they were the owners of a valuable invention, being an original design of a rotary pump; that prior to the last-mentioned date defendant Crosby Research Foundation, Inc. represented itself to be and was widely reputed to be engaged in the business of developing, exploiting and commercializing inventions for the mutual benefit of inventors and said defendant corporation. It was then alleged that for some time prior to May 15, 1944, plaintiffs had been negotiating with defendant Foundation for a contract under the terms of which the latter should undertake "to do certain things by way of developing, exploiting and commercializing the said newly invented rotary pump; that one of the essential elements of such projected contract was, and still is, the nature and extent of the acts that the said defendant Foundation was to perform by way of effecting and accomplishing such development, exploitation and commercialization of said invention; that another essential element of said projected contract was, and is, the nature and extent of the obligation, on the part of the defendant Foundation, to prosecute, defend, protect and improve any and all patent rights obtained or obtainable in connection with the said invention."

It was then averred that on or about May 15, 1944, plaintiffs and defendant Foundation "did agree upon certain elements of such proposed contract and reduced said matter to the form of a written instrument." A copy of such written contract was attached to the amended complaint, marked "Exhibit A." Plaintiffs then alleged that "said purported

contract is not valid, binding or enforceable; that it is not a contract."

By their answer defendants denied that the aforesaid contract did not contain all of the details agreed upon between the parties; denied that the contract was not valid, binding or enforceable, and denied that there was an 'actual controversy between the parties thereto relating to their legal rights and duties under such contract. As a separate defense, defendants alleged that since the execution of the written agreement, and relying thereon, the defendants had in good faith vigorously prosecuted the development, exploitation and commercialization of the invention; had promptly paid to plaintiffs all the royalties provided for in said contract, and that in addition to the minimum royalties reserved in the contract defendants had expended in developing, exploiting and commercializing said invention more than $4,000.

The contract in question, denominated an "exclusive license agreement," was entered into by plaintiff Clyde H. Brawley as party of the first part and defendant Foundation as party of the second part. The agreement set forth that plaintiff Brawley had assigned to the other plaintiffs herein an undivided one-fourth interest in and to any and all proceeds, earnings or accruals derived by him by virtue of said invention. Although plaintiff Brawley appears as party of the first part in said agreement, the same is signed by all of the plaintiffs. After reciting the respective interests of plaintiffs in and to the rotary pump invention and that defendant Foundation was engaged in the business of "research, development, production and commercialization of new articles of commerce" and was desirous of acquiring commercial rights to the aforesaid invention "for the purpose of introducing said invention as a new and useful product," the pertinent provisions of the contract provided that for and in consideration of the payment of the sum of one dollar by second party and "further sums and considerations as hereinafter set forth, the mutual covenants of the parties hereto herein made, and the faithful performance thereof," the first party, with the knowledge and consent of his associates, granted to second party "an exclusive license for the use of said inventions together with any improvements thereon made or to be made, and benefit of disclosures or other claims to novelty made or to be made by said first party, together with any application or applications for letters patent thereon made or to be made in the

United States or countries foreign thereto." It was further provided that the term of said license should be for the "full life of any patent or patents to be issued to first party on said inventions, any improvements thereon, developments thereof, or anything pertaining thereto."

After granting to second party the right to file application or applications for letters patent on said invention or any improvements thereof, and to defend against any interference or infringement proceedings, as well as to file infringement proceedings, and plaintiff Brawley agreeing to make himself available for consultation or assistance in matters relating to tests, development and improvements in connection with the invention and in connection with applications for letters patent, it was provided that the second party should pay to the first party a royalty based upon the total net sales, which it was provided should be construed to mean the "gross sales less returns, allowances and normal trade discounts," said royalty to be computed upon the following basis: (1) up to and including net sales in the amount of $500,000, a royalty of six per cent of the net billing thereof; (2) upon net sales in excess of $500,000, a royalty of five per cent of the net billing thereof. The agreement provided that "the aforesaid royalty payments shall be based upon the total net sales of said inventions made each respective calendar month throughout the life of this license, and payment therefor shall be made to first party by second party each calendar month on or before the twentieth (20th) day thereof." The agreement then provided that the party of the second part was to pay to the party of the first part a minimum monthly royalty of $100 each calendar month, commencing with July, 1944, and continue the payment of such minimum royalty for a period of six months; that commencing with January, 1945, a minimum royalty of $200 should be paid each calendar month thereafter.

The contract further provided that in the event of a dispute between the parties thereto involving their respective rights, such dispute should be submitted to arbitration for decision; that such arbitration was to be conducted in accordance with the provisions of title X, part III, of the Code of Civil Procedure of the State of California, each party selecting one arbitrator and the arbitrators so chosen should select a third, and the three arbitrators so selected should constitute the board of arbitration, "whose decision shall be final."

It was further provided that in the event of default of either party in the faithful performance of the terms and conditions of the contract and the failure of the party in default to cure the same within thirty days after notice from the other party, "this license may, at the option of the party not in default, be terminated by a notice in writing served upon the party so in default. Such cancellation and termination shall become effective thirty days from and after the day of such notice."

It was then provided that "second party may at its option terminate this license upon sixty days' written notice served upon first party and in accordance with the conditions and limitations hereinafter set forth." These conditions and limitations provided that in the event of such cancellation by the second party the latter should fully release to the first party all "claim, right, title and interest in and to said inventions, letters patent thereon or applications therefor, and no claim or obligation shall be made or allowed by either party hereto against the other in any manner whatsoever except as may relate to the aforesaid royalty payments which second party shall be required to make in full to the first party as of the last day of sales and account therefor as hereinbefore defined."

The cause proceeded to trial before the court sitting without a jury, at which time the plaintiffs produced one witness, L. P. Gibford, himself a plaintiff, who testified as to the signing and execution of the contract. The contract was then offered in evidence and the plaintiff rested.

The testimony offered by the defendants was equally meager, consisting of that given by Laurence E. Crosby, one of the defendants, who testified that he was president of the defendant Foundation; that "pursuant to the contract, plaintiffs' Exhibit No. 1, Crosby Research Foundation expended moneys for the development of the pump and payment of royalties. By payment of royalties I mean the royalties provided for in plaintiffs' Exhibit 1. . . . The moneys were paid out for salaries, sample pumps, royalties, including the payments on Mr. Gibford's home, which he was about to lose, which was $250. The balance of over $4,000 was expended on the pump and its development plus the royalties."

It was conceded at the trial that when this action was commenced plaintiffs "refused to accept the royalties because they had disaffirmed the contract." The defendants thereupon rested.

The court found that all of the allegations contained in plaintiffs' amended complaint were true, and that "there was some evidence that a substantial sum of money was spent by, or on behalf of, the answering defendants; but that there was no evidence as to how much was spent by the Crosby Research Foundation, Inc., nor by any of the other answering defendants, and no evidence as to what any such sums were spent for; that there was no evidence tending to prove any other allegation of the 'Further, Separate and complete Defense to the Amended Complaint', and, therefore, that the allegations of said affirmative defense are found to be untrue."

The conclusions of law filed by the court recite that the prime purpose of plaintiffs in entering into the contract with defendant Foundation was to secure from the latter a promise and obligation to "develop, exploit and commercialize" the plaintiff Brawley's invention; that the contract which was prepared by defendant Foundation gave the latter an "option" to develop, exploit and commercialize said invention, but did not "require" defendant Foundation "to do anything by way of developing, exploiting or commercializing said invention"; that one of the considerations which induced plaintiffs to contract away the exclusive right to use the said patent "was the promise of said Foundation to pay the inventor 6% of net sales up to one-half million dollars; but that there was no obligation to do *anything* in the direction of producing or inducing or making any sales; that there was no 'meeting of the minds' " between the parties.

As a further conclusion of law the court determined that while plaintiffs were dependent upon the promise of defendant corporation to pay percentage royalties "if there were any sales," and to pay a minimum royalty irrespective of sales, that defendant Foundation "reserved the unrestricted and arbitrary right to cancel the entire contract at its option; that, if this were a valid 'meeting of the minds' at its inception, it had no 'mutuality of consideration' as an executory contract." The court further concluded that "if this instrument constituted a valid contract at its inception, it furnished only a basis upon which the parties might deal so long as it was mutually agreeable, with no obligation upon either party requiring a continuance of the relation."

With reference to defendants' affirmative defense, the court as a conclusion of law determined that the matters therein set forth, "if proved, could not operate to estop the plaintiffs'

asking the court to declare the contract unenforceable''; that because at its inception the contract lacked ''mutuality of obligation'' or consideration, the facts set forth in defendants' affirmative defense could not supply such requisites; and that for the recovery of anything of value furnished by defendant Foundation to plaintiffs at the latters' request which in law they were required to restore to defendant Foundation, that the latter had an adequate remedy at law.

By its judgment the court decreed the agreement in question to be void and unenforceable; that defendant Foundation had no right, title or interest thereunder in and to the patents therein referred to; that defendant Foundation be enjoined from exercising any of the rights purportedly conferred upon it by said agreement, and that it deliver to plaintiffs drawings, designs, plans, specifications, test-models, patent-applications and any other papers or documents received pursuant to the agreement in question.

Since the court decreed that the contract is void and unenforceable, we shall first test the same for validity. By its terms the first party granted to second party the exclusive license to exploit, manufacture, sell, use or license the invention for the life of any patents issued or to be issued thereon. First party, Brawley, agreed to make himself available at the expense of second party for consultation and assistance relative to any improvements and applications for patents. The second party was granted the right to file applications for letters patent on the invention or on any improvements or development thereof and to defend the same against infringement; all such applications and actions to be in the name of the first party.

In return for the grant of the right to develop, manufacture, exploit and sell the rotary pump, the second party agreed to at all times acknowledge the invention and the first party's right thereto; agreed not to contest the validity of any patent covering the invention in question, and to pay the first party, in consideration of the rights conveyed, a royalty upon the net sales of the pumps made and sold under the license. The term ''net sales'' was defined in the agreement. The amount of the royalties and the basis for computation thereof was clearly set forth, as hereinbefore narrated, as were the dates of such royalty payments. It was provided that a statement of sales made should accompany each royalty payment. A minimum royalty of $100 per month during the year 1944 was provided for, with a monthly royalty of $200 per month

commencing with January, 1945, regardless of the amount of sales made. Provision was made for arbitration in the event of dispute, but plaintiffs did not resort thereto. Should either party default the other was authorized to terminate the contract by giving thirty days' notice in writing to the defaulting party. The second party was empowered to terminate the contract at its option upon giving sixty days' written notice of such intention to first party, provided, however, that should second party exercise its right of termination, it would release to first party all rights under the contract and surrender all inventions, applications or improvements thereon made or held by second party, and would continue to pay royalties in accordance with the agreement during the aforementioned sixty days.

We perceive no invalidity in this contract. Respondents, however, first contend that the contract is incomplete and therefore void because the parties thereto failed to agree upon an element which was essential to the agreement and therefore there was no "meeting of the minds." The "essential element" to which respondents refer is the claimed absence in the agreement of "any expression of what the Foundation undertook to do by way of developing, exploiting and/or commercializing the invention." While it is true that the contract contains no express provisions as to when the second party should commence the production and sales of the rotary pump, there is contained in the agreement a provision that at all times, whether or not pumps were produced or sold, second party should pay first party a minimum royalty commencing forty-five days after the execution of the agreement, and the minimum royalty was doubled effective January, 1945. Thus it seems obvious from these provisions that the parties had in mind that sales might not be made immediately and that during the period of development, production and exploitation of the pump by second party, the latter was to pay a fixed royalty. Had the parties contemplated that production and sale of the pump should commence within a specified time they could easily have so provided. By the very terms of the contract it was provided that the first party "is now desirous of securing further development, exploitation and commercialization of said inventions." That certain development work would have to be done was obviously in contemplation of the parties, because in paragraph 1 of the agreement it is further provided that the license granted to

second party in the agreement "shall be the right to develop, exploit, manufacture, sell, use, license or sublicense said invention or any rights thereto, to the sole benefit and use of said second party, *except for the payment of* royalties and the performance of any other obligations on the part of the second party as hereinafter set forth." (Emphasis added.)

The admitted payment of the royalties conferred upon the first party a benefit which constituted a good consideration within the meaning of section 1605 of the Civil Code, and consideration supplies mutuality of obligation to the contract. If the amount of the minimum royalties was not adequate, respondents should have so determined in their own minds before signing the contract, but having signed it, they must live up to their agreement. The law does not weigh the quantum of the consideration. (6 Cal.Jur., p. 169.)

Contrary to the finding of the trial court, the contract with which we are here concerned does require that appellant Foundation manufacture and sell the pump. The terms of the contract, instead of relieving appellant, as claimed by respondents, from exploiting, manufacturing and selling the pump, on the contrary require just that. In this, as in every contract, there is the implied covenant of good faith and fair dealing; that neither party will do anything that would result in injuring or destroying the right of the other to enjoy the fruits of the agreement. (*Universal Sales Corp.* v. *California Press Mfg. Co.*, 20 Cal.2d 751, 771 [128 P.2d 665]; *Silva* v. *Providence Hospital*, 14 Cal.2d 762, 773 [97 P.2d 798]; *Long Beach Drug Co.* v. *United Drug Co.*, 13 Cal. 2d 158, 164 [88 P.2d 698, 89 P.2d 386]; *Citron* v. *Franklin*, 23 Cal.2d 47, 56 [142 P.2d 16]; Civ.Code, §§ 1655, 1656.) The law will therefore imply that under its agreement appellant was obligated in good faith and by its reasonable and best efforts to develop, exploit, produce and make sales of the rotary pump in question. That appellant did not do so was not alleged in the pleadings or proved at the trial.

The cases cited by respondents in support of their claim that the contract before us is incomplete are distinguishable, in that the cited cases present situations wherein the contract was incomplete on its face and the deficiencies of the contract were in relation to matters treated in the contract, while in the case at bar, as admitted by respondents, the matters now claimed to be necessary to a "complete" contract are not mentioned in the agreement. In the instant case the agreement reflects a complete mutuality between the parties

wherein the first party granted to second party a license to improve upon, develop, exploit, produce and sell a certain rotary pump invented by the former, in consideration of the payment of certain minimum royalties pending development and sale of the product, with percentage royalties thereafter, but in any event and regardless of the amount of sales, the first party was at all times to receive the minimum royalty provided. ■ Lack of mutuality is tantamount to want of consideration, and where, as in this case, sufficient consideration is otherwise present, mutuality is not essential. It becomes essential only when its absence would leave a party without a valid or available consideration for his promise. (*Clarey* v. *Security Portland C. Co., Inc.,* 99 Cal.App. 783, 786 [279 P. 483]; 17 C.J.S., § 100, p. 444; 12 Am.Jur. § 13, p. 509.)

■ Respondents next insist that the judgment must be affirmed because the defendant Foundation's arbitrary right of cancellation destroys the mutuality. While it is true the contract provided that the second party might at its option terminate the same upon sixty days' written notice served upon first party, the exercise of such option was required to be, as provided in the contract, ''in accordance with the conditions and limitations hereinafter set forth.'' These conditions and limitations were declared in the contract to be as follows: ''In the event of cancellation and termination of this license as hereinbefore provided second party shall fully release to first party all claim, right, title and interest in and to said inventions, Letters Patent thereon or Applications therefor and no claim or obligation shall be made or held by either party hereto against the other in any manner whatsoever, except as may relate to the aforesaid royalty payments which second party shall be required to make in full to first party as of the last day of sales and account therefor as hereinbefore defined.'' It was upon this provision of the contract that the court concluded as a matter of law that ''the Foundation reserved the unrestricted and arbitrary right to cancel the entire contract at its option; that, if this were a valid 'meeting of the minds' at its inception, it had no 'mutuality of obligation' or 'mutuality of consideration' as an executory contract; that, if this instrument constituted a valid contract at its inception, it furnished only a basis upon which the parties might deal so long as it was mutually agreeable, with no obligation upon either party requiring a continuance of the relation.''

We are constrained to hold that the weight of authority in California is to the effect that a provision in a contract that it shall come to an end at the option of one of the parties under the terms, conditions and limitations embodied in the agreement before us, does not render such contract unenforceable. That a contract containing an option that it may be cancelled by one of the parties by written notice is a valid provision and is supported by the original consideration was the holding in *Thomas* v. *Anthony,* 30 Cal.App. 217, where, at page 222 [157 P. 823], we find the following:

"The contract also reserved to the defendant the right to cancel it upon fifteen days' notice, unused deposits to be thereupon returned. We do not think, as urged by the appellant, that this provision of the contract makes it void for lack of mutuality. In Page on Contracts, section 306, the author in treating of this phase of the law, says: 'If A and B make mutual promises to each other, and A is to have the right at his election to withdraw from the contract and relieve himself from all liability thereunder at his pleasure, some courts hold that such contract is without consideration. . . . If, however, A must give notice for a substantial period of time before ending his liability under the contract, and such liability is to last until the end of time for which the notice is given, A's promise is a consideration. *Thus if A has the right to end the contract at the end of any year, or on ten days' notice, or on two weeks' notice, A's promise is a consideration.'* " (Emphasis added.)

And in the case of *Associated Oil Co.* v. *Myers,* 217 Cal. 297, 301 [18 P.2d 668], which involved a lease terminable upon ninety days' notice by the lessee, the court said: "First of all it is argued that the agreements lack mutuality of remedy and obligation. The argument advanced by respondents to support this assertion *is based upon the proposition that the lease granted appellant the right to cancel upon giving a ninety days' written notice.* The authorities are unanimous to the effect that when the contract is terminable at the will of the plaintiff he may not have relief against the defendant. *But to assert, as a matter of equity, that a lease for a three months' period is of no value and entitled to no protection is, we think, going further than the doctrine warrants.* Furthermore, it is a recognized rule of equity that where, as here, 'the reciprocal obligations of the parties to the contract are concurrent, the continuance of the obligation of each to perform his part being dependent upon continued performance

by the other, any material injury which otherwise might be sustained by the defendant, of whom performance is required, in consequence of his not having an efficient remedy for coercing future performance by the plaintiff, is effectually avoided by making the defendant's obligation to continue performance dependent upon a continuance of performance by the plaintiff.' '' (Emphasis added.)

In the instant case we are impressed that to assert as a matter of equity—where one of the parties to the contract may terminate the same provided he gives sixty days' written notice, during which interim he is obligated to pay the royalties provided for in the agreement, and at the expiration of which notice he is required to restore to the other party all right, title and interest in and to the inventions, letters patent thereon and pending applications for patents — that such sixty days' contract is without value and not entitled to protection, goes further than the doctrine relied upon by respondents warrants.

Volume 12 American Jurisprudence, section 434, page 1014, reads in part: ''The assent of both parties to a rescission is sometimes expressed in the original contract, as where an option to rescind is given to one or both of the parties. One of the parties to a contract may end it if the contract so provides.'' In 17 Corpus Juris Secundum, section 399, page 888, it is said: ''A contract may provide that it shall come to an end at the option of one or either of the parties, and such a stipulation when fairly entered into will be enforced if not contrary to equity and good conscience. The presence of such a provision has no effect on the binding obligations of the contract as long as the parties continue to act under it before revoking or terminating it.''

The cases relied upon by respondents are readily distinguishable from the case at bar. In *Chas. Brown & Sons* v. *White Lunch Co.,* 92 Cal.App. 457 [268 P. 490], there was involved an executory contract whereby a corporation engaged in operating a chain of restaurants agreed, in consideration of the purchase by another corporation engaged in the hardware business of shares of stock in the restaurant corporation, to purchase in the future from said hardware corporation such wares as it needed and that the hardware corporation could supply. The court held that the contract was not binding for want of mutuality as it imposed no burdens, promises or restrictions upon the hardware corporation and the latter was

free to terminate the contract at will at any time. The court therein stated: "Had plaintiff discontinued its business or refused to sell its wares to defendant, defendant would have been without a remedy. A contract which can be terminated at the will of one of the parties *without liability for damages,* so far as it remains executory is not binding for want of mutuality." (Emphasis added.) In the cited case the promise made by defendant was a promise to enter into future contracts for the purchase of supplies from plaintiff which defendant might from time to time be in need of and which plaintiff could supply. The court quoted in part from 1 Elliott on Contracts, section 175, as follows: "Unless an agreement *to make a future contract* is definite and certain upon the subjects to be embraced therein, it is nugatory. Consequently, the acceptance of a proposition to make a contract, the terms of which are to be subsequently fixed, does not constitute a binding obligation." (Emphasis added.) Neither the facts nor the legal issues presented therein are at all similar to the ones confronting us.

In *Shortell* v. *Evans-Ferguson Corp.,* 98 Cal.App. 650 [277 P. 519], the contract was one containing a promise by one of the parties to enter into a future contract for the purchase of certain lots by reference to an unrecorded map. The holding was that the contract was void ab initio and unenforceable because it contravened the mandate of a statute, that the making of the contract was a misdemeanor, and the vendee might recover the money paid on such a contract. (Stats., 1907, p. 290, now incorporated in Bus. & Prof. Code, §§ 11538 and 11541.) While upholding appellant's further contention that the contract being void there was a failure of consideration and hence it was lacking in mutuality, the court definitely stated, "A brief analysis of the document in question demonstrates that it bound respondents to nothing"; that it contained a reservation authorizing the owner of the property "to return the above money" paid on account of the contract at any time "before a contract of sale is signed and approved by the owner," thereby giving to one of the parties the election to perform. Such is not the situation in the case at bar, wherein the right of second party to terminate the contract was conditioned upon the performance of the terms thereof by the payment of royalties during the interim between giving the notice and the effective date thereof.

Respondents place great reliance upon *County of Alameda* v. *Ross*, 32 Cal.App.2d 135 [89 P.2d 460], wherein the petitioner sought by means of a writ of mandamus to compel respondent as county auditor to issue a warrant in payment for materials ordered by the board of supervisors of Alameda County with which to repair a part of the Fruitvale Avenue Bridge across the Oakland Estuary, which portion of the bridge was used exclusively for the benefit of the Southern Pacific Company. It appears that the United States, through its Secretary of War, issued to the county of Alameda a license *revocable at will*, to use, maintain and operate the bridge in question across navigable waters. The license required the maintenance of the bridge in question by the county. The main, if not the sole question necessary to the decision was whether or not the board of supervisors could expend public money for maintaining or repairing that portion of the bridge used exclusively for the benefit of a private corporation. In that regard the court held that "the particular indebtedness which is involved in this proceeding constitutes a gift of public funds to a private corporation in conflict with article IV, section 31, of the Constitution of California." It is true the court further held that the expenditure was unauthorized "for the reason that the license is revocable at will by the Secretary of War and therefore lacks mutuality of obligations and consideration, which renders it void." Though it be conceded that such last-mentioned holding was necessary to the decision, it must, however, be borne in mind that the court treated the document in question as a license issued by sovereign authority, revocable at will and without notice. The same court, in *Rosenblatt* v. *California State Board of Pharmacy*, 69 Cal.App.2d 69, 74 [158 P.2d 199], held that a license issued by a sovereign "has none of the elements of a contract and does not confer an absolute right but a personal privilege to be exercised under existing restrictions and such as may thereafter be reasonably imposed." In the instant case we are not confronted with a "license" issued by a sovereignty, but with a contract between private persons, terminable by one of them only upon sixty days' written notice and subject to obligations and limitations imposed upon the party vested with the right of termination. In the Alameda County case the court recognizes that an option to terminate a contract on notice does not void every such contract. Quoting from 1 Williston on Contracts, page

365, section 105, the court says: "Since the courts, however, do not favor arbitrary cancellation clauses, the tendency is to interpret even a slight restriction on the exercise of the right of cancellation as constituting such legal detriment as will satisfy the requirement of sufficient consideration; for example, where the reservation of right to cancel is for cause, *or by written notice, or after a definite period of notice*, or upon the occurrence of some extrinsic event, or other objective standard." (Emphasis added.)

In commenting upon the provisions of the license in the Alameda County case, the court at page 145 says: "A careful reading of the document leaves no doubt it was the intention of the government, clearly expressed in unequivocal language, that it reserves the absolute right to revoke the license at will with or without cause. It contains no limitation whatever upon that arbitrary power. It is therefore void for lack of mutuality and for lack of consideration." No such situation exists in the contract now engaging our attention, and our examination of the Alameda County case does not impress us that it supports the ruling of the trial court that a cancellation clause of the nature and character contained in the contract here involved renders the agreement void.

■ It is not necessary that the provision giving to one party an option to terminate on substantial notice shall be supported by a consideration different from considerations supporting the entire agreement. One valid consideration supports each and all of the obligations of the contract. In this regard, the court in *Tennant* v. *Wilde,* 98 Cal.App. 437, 442 [277 P. 137], said: "On this point it may be said that where there is consideration for any of the agreements specified in a contract the contract as a whole cannot be said to lack mutuality or consideration nor can any particular promise or agreement contained therein be singled out and deemed inoperative because no special or particular consideration appears to have been given or promised for it. Mr. Page in his Law of Contracts thus states the rule: . . . 'While a consideration is a necessary element of every contract, it is not necessary that each separate promise or covenant should have a distinct consideration. If there is but one consideration offered in return for several promises, and it is accepted for them together, it will support them. This principle is often invoked in question of mutuality of obligation. If A gives value for two or more promises from B, B cannot claim that

one of such promises was not supported by consideration, though the parties have not apportioned the consideration to the separate promises. . . .' ''

As to defendants Laurence E. Crosby, J. Rex Davis and Major Pump Corporation, there is no evidence whatever connecting them with the contract in question or with any issue raised by the pleadings or made by evidence before the court.

In view of the foregoing conclusions at which we have arrived concerning the validity of the contract, it becomes unnecessary to give consideration to other grounds presented on this appeal.

The judgment is reversed and the cause remanded with directions to the court below to enter judgment declaring the contract valid.

York, P. J., and Doran, J., concurred.

A petition for a rehearing was denied March 11, 1946, and respondents' petition for a hearing by the Supreme Court was denied April 18, 1946.   Carter, J., voted for a hearing.